(53 South. 884.)

No. 18,141.

TURREGANO v. BARNETT et al.

(Dec. 12, 1910. Rehearing Denied Jan. 3, 1911.)

*(Syllabus by the Court.)*

1. CONTRACTS (§ 176*)—PARTNERSHIP (§§ 5, 20*) —USURY (§ 102*)—CONSTRUCTION OF CONTRACT—QUESTION OF FACT—EXISTENCE OF PARTNERSHIP RELATION—QUESTION OF LAW —TRANSACTION CONSTITUTING USURY.

What may be the terms of a particular contract is a question of fact. Whether the contract, as made, establishes the partnership relation, is a question of law. A loan of money, in consideration of an obligation to pay a fixed sum for its use, is not a contract of partnership; and, where the amount agreed to be paid exceeds the rate of conventional interest allowed by law, the contract is usurious, and the whole amount of interest paid is recoverable, save where included in a negotiable note or bond, etc.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 767–770; Dec. Dig. § 176;* Partnership, Cent. Dig. §§ 6, 7, 15, 16; Dec. Dig. §§ 5, 20;* Usury, Cent. Dig. §§ 241–258; Dec. Dig. § 102.*]

2. USURY (§ 75*)—AMOUNT REPRESENTED BY USURIOUS NOTE MERGED WITH ANOTHER LOAN.

Where, however, the amount represented in such note is, by consent and upon the theory that the agreement will be maintained, merged with another loan, for which usurious interest is agreed to be paid, and paid, the holder of the note, upon being condemned to refund the interest received under the merger, may fall back upon such note with regard to the interest which he might otherwise have collected thereon.

[Ed. Note.—For other cases, see Usury, Dec. Dig. § 75.*]

3. COMPROMISE AND SETTLEMENT (§ 15*)—SETTLEMENT OF BUSINESS TRANSACTION — EFFECT.

A settlement of business transactions, where, with full knowledge of all material facts, money is accepted and a receipt in full given, will not be disturbed in the absence of allegation and proof of error or fraud.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 51–53; Dec. Dig. § 15.*]

Appeal from Thirteenth Judicial District Court, Parish of Rapides; W. F. Blackman, Judge.

Action by J. P. Turregano against J. H. Barnett and others. Judgment for plaintiff,

and defendants appeal. Reversed, and judgment rendered for defendants on their reconvention.

Andrews & Hakenyos, for appellants. Blackman & Overton, for appellee.

### Statement of the Case.

MONROE, J. Plaintiff sues for the liquidation and settlement of an alleged commercial partnership between himself and J. H. Barnett and W. R. O'Neal, alleging that the partnership was formed on October 1, 1908, at which date he advanced $2,724.03, under an agreement that he should thereafter receive 60 per cent. of the profits of the business, and share the losses in the same proportion, and that on January 1st following he should advance the further sum of $1,-541.65, which amount said parties owed him. He further alleges that he made said second advance, as agreed, and that thereafter, on March 10, 1909, he was handed a check for $4,796.23, representing the amounts thus advanced by him, together with $553.33, asserted by defendants to be the 60 per cent. of the profits to which he was entitled—

"which check petitioner did not, in fact, accept in full settlement of the amounts due him by said partnership, or as a member of said partnership, but which check was accepted as a payment, pro tanto, on the amount due your petitioner, petitioner receiving said check solely for the reason that the sum advanced by him to the partnership was unsecured, and that the control of all the partnership funds was, without bond or security, in the hands of the said Barnett & O'Neal, and solely for the purpose of protecting petitioner against loss of the amount advanced by him to said partnership, petitioner receiving the funds called for by said check as a reimbursement to him of the amount advanced by him to said partnership and a payment, pro tanto, on the amount of profits coming to him as a member of said partnership, petitioner not knowing, then, nor yet, the real or actual amount of the profits of said concern, nor being furnished before, at the time, or since with any statement of the partnership business or business affairs, and accepted said amount of $533.-33 only as a partial settlement."

He further alleges that, between January 1 and March 10, 1909, the profits of the business amounted to at least $4,000, and he prays that a liquidation and settlement be ordered, and that he have judgment for 60 per cent. of the profits, less the $533.33, already received.

Defendants deny that there was any such partnership as alleged, and aver that on July 10, 1908, they borrowed from plaintiff the sum of $1,500, for which they gave their note, payable September 1st, bearing interest on its face at 8 per cent., and for the use of which they further agreed to pay 12 per cent. additional interest; that on September 1st said note was taken up and a new one issued for $1,541.65, also bearing interest on its face at 8 per cent. and made payable on December 31st, the additional $41.65 included therein representing the interest at 20 per cent. on the note of $1,500 up to September 1st; that about October 2d they borrowed from defendant the further sum of $2,724.03, and it was then agreed that for the use of the whole amount $4,285.68, thus loaned by him, defendant should thereafter receive $100 per month. They further aver that on March 11, 1909, they had a full and complete settlement with plaintiff, paying him $4,796.23, as in full of all demands, and that said amount included usurious interest to the amount of $575, which they are entitled to recover, and they pray for judgment accordingly, and for damages to the amount of $5,000.

It is beyond dispute that on July 10, 1908, defendants borrowed from plaintiff $1,500, for which they gave their note, payable September 1st bearing on its face interest at 8 per cent., and that they agreed to pay, in addition to such interest, $15 per month (making the 20 per cent. as stated in the answer), all, without reference to any profits or losses that defendants might make in their business. But, though, by the allegations of his petition, to the effect that the partnership began on October 1, 1908, plaintiff judicially

admits that it did not begin with the transaction thus referred to in July, we find that he testifies as follows:

"Q. You know Mr. J. H. Barnett and Mr. W. R. O'Neal? A. Yes, sir; I do. Q. Did you ever enter into any agreement with either of them with reference to a partnership? A. I did. Q. When was that? A. Some time in 1908. I believe between some portion of July 10th, if I'm not mistaken; some part of that month. Q. With whom did you have an agreement? A. Well, in July, I had a conversation with Mr. Barnett. Q. With whom did you have the conversation? A. With Mr. Barnett. Q. Did you enter into a contract with him at that time? A. I did. * * * Q. What kind of a contract was that—a contract of partnership? A. Yes, sir; practically so. * * * Q. Did they have any money? * * * A. No, sir. They were in partnership here and doing a good business and well known, and I agreed to let them have $1,500. He told me that they would give me a note for security to secure me in the business, and that the note was secured by O'Neal, drawing 8 per cent. He said that as an interest in the business I would then see what was in it, and, 'when you do, you will put further money in it.' He agreed to give me $15 a month for the use of that money, and also that they would furnish me a statement, on the 1st of every month, showing what the business is doing and everything in connection with it. I paid them the money, and on the 1st of September we had a little money, and he said, 'No use drawing the money out. You might as well leave it in.' And the additional amount, for a new note I got was $1,541.65. * * * Q. You first lent them $1,500, and they were to give you 8 per cent. and $15 a month? A. Yes, sir. * * * Q. Now, when that note matured, they wanted you to put in an additional amount of money? A. Yes, sir. * * * Q. About a month later you did put in $2,700? A. Yes, sir. Q. You were to get three-fifths of the profits? A. Yes, sir; after all expenses and any other costs. Q. You were to bear your proportion of the losses? A. Yes, sir. Q. What was to be done with the $1,500 note? A. The $1,541.65 was to continue as a note until the 1st day of January, and at that time the entire amount was to enter into this partnership agreement. * * * Q. From October to January you were to get three-fifths of, what? A. Three-fifths of the net proceeds from $2,724, from October 1st to January 1st. Q. After January 1st, you were to get, what? A. I was to get three-fifths interest in the net profits on the whole amount of $4,300. Q. In other words, you were a partner after January 1st to the extent of three-fifths interest? A. Yes, sir."

The foregoing testimony was given by plaintiff on his original direct examination, and in response to questions propounded by his own counsel.

The defendant O'Neal testified in part as follows:

"The first transaction was a loan to us by Mr. Turregano on July 10th of $1,500, for which we gave a note payable September 1st. The consideration was that we were to pay him 20 per cent. per annum for the use of this until September 1st. Q. What became of the note on September 1st? A. It was paid. It came due, and we gave him a new note for the old one. The new note was for $1,541, which was the old note, plus the interest of 20 per cent. That new note given him on September 1st was payable on December 31, 1908; that same year. * * * The understanding about the last note was that we were to pay him 20 per cent. for that. On October 2d, or some time in the * * * latter part of September, * * * we borrowed from Mr. Turregano an additional sum of $2,724.03, * * * and it was understood that the $2,724 and the note which was running until the latter part of December—until the 1st of January—for the use of the two amounts, as he told us when he loaned us the additional amount of $2,700, would be that he would not charge us any interest on the note any longer, but that we would pay him $100 a month for the two sums, the $2,700 and the $1,541. Q. Did you have a conversation with Mr. Turregano and Mr. Barnett in reference to his statement you just made? A. Yes, sir; that was held in Mr. Turregano's office the latter part of September, on election day. Q. Can you state what took place at that conference, as near as possible? Give the conversation of Mr. Turregano, yourself, and Mr. Barnett in reference to this business transaction. A. Well, when Mr. Turregano told us that, when we were presenting the matter to him, he told us he could loan us just $3,000, in addition to the $1,500, and we asked him what interest he would want for that amount. He put it this way, then. He said: 'I am a man who wants to do the right thing, and I believe you are the same way, and you will treat me right'; and he said, 'I will treat you right.' He said: 'You go ahead, and, after the 1st of January, we can, if you have made any money, or considerable profits, arrange matters. You can pay me whatever you feel like, and, if you make but little, I won't expect much.' And in our reply to that we told him that we did not like to do business in that way, and we would want some definite understanding. We would want to know what we would have to pay him for the use of the money, and we would have to know before we could accept the money. He then seemed anxious to state what he would charge us, and, finally, he told me: 'I have two sons in school, and they are costing, right along, $100 per month, and, if you could see your way clear to pay me $100 on these two sums up to the 1st of January, I will be glad.' I said: 'If $100 will satisfy you, you shall have it.' He said: 'I will give you the money in the morning.' So I told him: 'All right, we would give $100 a month for that money, those two sums, up to the 1st of Jan-

uary.' It was agreed, while we were discussing the matter, that, if we found we could make anything, by paying that money, for the use of the money, after January the 1st, and having it, we would settle up. And it was agreed that, further, that we would make up a statement of what we had made, and I should let him have a statement for a settlement on the 1st of January, which I did, and it was presented to Mr. Turregano by Mr. Barnett, and he said that he was too busy to dispose of the matter at that time, and I never heard any more of it until some time after the 1st of March, this year—I mean last year, 1909. The first news I had of Mr. Turregano's dissatisfaction of this credit was brought to me by Mr. Barnett, who said that Mr. Turregano told him that he expected 60 per cent. or ⅗ interest in the profits of the business and not $100 a month, as originally agreed upon, and he wanted to know what I thought about it, and I told him that I was not willing to do this, as it was unbusinesslike and unreasonable. I went to work at once, and made out a statement of our affairs up to March 8th. Then I went to work to procure funds to pay Mr. Turregano, both the principal and interest, of $100 per month, and had a settlement with him, March 9, 1909."

On the statement referred to, furnished by defendants to plaintiff, of the business up to January 1, 1909, the following items appear under the head "Liabilities," to wit:

Bills payable (note J. P. T.)......... $1541.65
J. P. Turregano (loan)............. 2724.03
J. P. Turregano (bonus & int)...... 300.00

The statement prepared and submitted to plaintiff as the basis of the settlement, which was made on March 9, 1909, reads as follows:

Alexandria, La., 3/9/1909.
Mr. J. P. Turregano in account with Barnett & O'Neal, Millers & Brokers, Manufacturers of Pure Corn Chops.
\*       \*       \*       \*       \*       \*       \*

1909.
March 3.         1 Sx oats            2.80
                 Cash to balance in full   4796.23

Credit.
1908.
Oct. 2.   [Paid J. P. Turregano]  By cash loaned     $2724.03
1909.
March 9.          Note due 12/31/08          1541.65
March 9.          Int. on above two amts.
                  10/1/08 to 3/9/09—5 1/3
                  mos.              4799.03    533.35
                                             $4799.03

The word and signature, "Paid J. P. Turregano," are written across the face of the

foregoing statement, and it is admitted that they were written by plaintiff at the time that he accepted the check for $4,796.23, which check is dated March 9, 1909, bears upon its face, the words, "In full of all demands to date," is indorsed by plaintiff, and is admitted to have been collected by him. There is also in evidence a receipt given by plaintiff at the time of the settlement in question which reads:

"3/9/09.
"Received of J. H. Barnett seven dollars and eighty five cents, in full of all demands
      "[Signed]          J. P. Turregano."

It appears that the check above mentioned was tendered to plaintiff by Barnett, and that plaintiff declined to receive it and asserted the claim, which he now asserts, for 60 per cent. of the profits, whereupon there was something of a difficulty, and the two men separated. Later, on the same day, O'Neal went to plaintiff's office, with the same check, and he tells the story of what occurred, as follows:

"When I first went to his office, he told me that the statement \* \* \* that I had made out was not in accordance with an understanding that he had with Mr. Barnett. I said: 'It is in accordance with the understanding you had with me.' He said: 'I am sure that you are acting in good faith and that this statement is strictly in line and accord with the conversation and agreement we had in our office.' To that I replied: 'You have all your money, this $2,724.' He went ahead to say that, in addition to this, that it was not in accordance with some understanding that he had with Mr. Barnett, and I reminded him of the fact that Mr. Barnett and myself were in partnership, and that I carried the responsibility of securing funds for the operation of the business, which he admitted, and told him that any agreement he had with Mr. Barnett that was not in harmony with the three of us, was not binding on me, and he said that Mr. Barnett had told him that he told me about the other arrangement, and I asked him about what arrangement, and he asked me to go over to the First National Bank with him, and it was then that he told me that he was going to get 60 per cent., and I told him that I never heard or knew anything about that. I told him that the agreement between the three of us was that we should pay him $100 per month for this money, no more, no less, up to the 1st of January. He admitted that this was the

agreement and understanding that we had in his office. He agreed with me, and said, 'Hand the check over to me,' which was done, and I handed him a receipt for Mr. Barnett's personal account, and, as I did not have a statement form, he wrote it out in his own handwriting and handed it to me. We shook hands and parted, which ended the discussion. There is one other thing I would like to say. At the time we got this money, $2,724, and before that, and at the time he loaned us $1,500, Mr. Turregano had never had any business transactions with us of any nature, and he found out, or knew, that I owned some property, and that I was responsible for $1,500; if we did not make it in the business, that I was good to pay it. After he consented to let us have this $1,500, and we were to sign a note for it—W. R. O'Neal and J. H. Barnett—he turned to me, and shook his hand in my face, and said: 'I am looking to you, and to you, personally, for the return of this money.' He said: 'I know Mr. Barnett has no money, except what he makes out of the business, and you are the man I am looking to, and to you, personally.' I told him that I would see that he did not suffer any loss. In October, when we borrowed this other amount, * * * he seemed to be very anxious about arrangements being made to return this money. Finally, after he said that he would let us have the additional amount, he went through the same gestures that he did when he let us have the $1,500. He slapped me on the shoulder two or three times and shook his finger in my face, and said: 'I am looking to you, and to you only, for the return of this money.' And I said: 'Mr. Turregano, I will see that there is no loss, and I am going to see that you get it back. I realize that you hold me personally responsible for the whole amount, because I have property to cover the amount.' And I made it a point to get his money back to him."

On his redirect examination the witness said:

"I asked Mr. Turregano, before I turned this check over to him, if it was thoroughly satisfactory with him, and if the settlement carried out the agreement with Barnett & O'Neal at the time this money was loaned to us, and he told me that it was exactly in accordance with the understanding he had with me, and that he would accept it as being a full and complete settlement."

Plaintiff, having been called in rebuttal, was asked the following question and answered as given below, to wit:

"Mr. Turregano, Mr. O'Neal has testified on the stand that you voluntarily accepted a check for $4,700 on which was written, 'In full of all demands up to date,' and that you signed a receipt or signed the statement that he gave you as having been paid by him, and that it was satisfactory to you and in full accordance with your agreement that you had with Mr. O'Neal. I will ask you if that is a fact? A. It was a voluntary agreement because Mr. O'Neal placed the matter in such a way that I could but believe that, if I did not take the check, I would get into litigation with him and might lose the business, because, as I told him, I had nothing to show for my money, no papers nor writing, to show the amount of the investment. I appealed to him for the better part of half an hour, went over the whole matter with him and told him of the agreement, mentioned all the conversations and agreements made between myself and Mr. Barnett, and he stood pat and said he would not stand for that, so that I thought it best to take the check, and I did take this check to secure my principal."

There is some other testimony with regard to conversations between plaintiff and Barnett, and to the effect that Barnett spoke of plaintiff on several occasions as their "backer," and as their "partner"; the fact being, as it appears to us, that neither he nor the plaintiff had any very definite idea of the legal signification of the term "partner."

### Opinion.

What may be the terms of a particular contract is a question of fact. Whether the contract, as made, establishes the partnership relation, is a question of law. In the instant case we conclude, from the whole testimony, that plaintiff loaned defendants $1,500, for the use of which they agreed to pay for two months' interest at the rate of 20 per cent. per annum, that he subsequently loaned them $2,724.03, and that for the use of the total of the two amounts (plus $41.65), or say, $4,365.68, they agreed to pay, and did pay, for 6 months $100 per month (or, at the rate of something over 27 per cent. per annum).

The contract was not one of partnership, for there was no agreement for the sharing of the profits or losses of the business. But, if there had been such a contract, plaintiff's rights concerning it are concluded by the settlement voluntarily made by him with defendants with full knowledge of all material

facts, and which was superinduced by neither error nor fraud. Gray v. Lonsdale, 10 La. Ann. 749; Wells v. Erstein, 24 La. Ann. 317; Haile, Adm'r, v. McGhee, Snowden & Violett, 29 La. Ann. 350; N. O. & N. E. R. Co. v. Louisiana C. & I. Co., 109 La. 13, 33 South. 51, 94 Am. St. Rep. 395; Hager v. Thompson, 66 U. S. 80, 17 L. Ed. 41.

The original contract, of July 10, 1908, was usurious, but the interest to September 1st was included in the note of that date, and is beyond recovery, and as the note of September 1st, bore interest at 8 per cent. from its date, and the amount thereof up to March 10, 1909, was included in the settlement, that amount is also beyond recovery. The account will therefore stand as follows:

Amount actually paid.......................... $4,796.23
　Amount actually due:
Note of Sept. 1, 1908................. $1,541.65
Int. from Sept. 1/08, to Mch. 9/09, at
　8 per cent........................... 70.36
Loan of Oct. 1/08..................... 2,724.03 　4,336.04
　　　　　　　　　　　　　　　　　　　　　　　　 ─────────
　Amount recoverable ............ 　$ 460.19

See Act 68 of 1908; Flower v. Millaudon, 6 La. 707.

Defendants' counsel suggest that, as the note of September 1st was merged in the usurious contract of October 1st, no interest can be allowed on it after the date last mentioned. But plaintiff's rights, as holder of the note, were abandoned only upon the theory that the contract which resulted in the merger would be maintained, and, as it is not maintained, we think plaintiff should be allowed to fall back upon his note.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed; that plaintiff's demand be rejected and his suit dismissed; and that defendants have judgment against plaintiff, on their claim in reconvention, in the sum of $460.19, with legal interest thereon from judicial demand until paid. It is further decreed that plaintiff pay all costs.